UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thomas John Jelliffe,

    Plaintiff,

    v.                                                             Civil Action No. 5:11-CV-89

Michael J. Astrue,
Commissioner of Social Security,

    Defendant.

# REPORT AND RECOMMENDATION
(Docs. 12, 15)

Plaintiff Thomas Jelliffe brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Jelliffe's motion to reverse the Commissioner's decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 15).

For the reasons stated below, I recommend that Jelliffe's motion (Doc. 12) be GRANTED, the Commissioner's motion (Doc. 15) be DENIED, and the matter be REMANDED for further proceedings and a new decision.

## Background

Jelliffe was thirty-seven years old on the alleged disability onset date of April 2, 2007. He finished school through only the eighth grade, but later achieved his GED. He has job experience as a housekeeper, an auto lot attendant, a ski lift operator, a

stock clerk, a furniture assembler, a fence installer, a pizza deliverer, a groundskeeper for a construction company, a dishwasher, a fast food worker, and a chimney sweep. Jelliffe has two children, but they live with his sister, who has custody of them. (AR 622.) He resided with his girlfriend or wife for portions of the alleged disability period, although at the time of the administrative hearing, he was in jail for domestic assault. (AR 32, 623, 886.)

In 1974, when Jelliffe was four years old, he was struck by an automobile and suffered a depressed skull fracture. (AR 331.) He had an emergency operation, and hospital notes from that period indicate that he recovered well, although he was left with a pronounced scar on his skull. (AR 327, 331.) More recent medical records document that, as a result of the 1974 automobile accident, Jelliffe may have suffered symptoms of traumatic brain injury ("TBI"). (AR 409-10.) In 1988, when Jelliffe was eighteen years old, the record documents that he was in another automobile accident, this time injuring his left forearm and resulting in a steel rod being implanted in his wrist. (AR 551, 622.) As a result of the 1988 accident, Jelliffe reports that he has a deformity and diminished grip strength in his left hand, as well as no sensation in the fourth and fifth fingers of that hand. (AR 36, 327, 434, 652.) In addition to these problems, Jelliffe has a history of dependence on drugs, particularly marijuana and cocaine. (AR 623.)

In July 2008, Jelliffe filed applications for social security income and disability insurance benefits. In his disability application, he alleged that he became unable to work on April 2, 2007 as a result of the following impairments: bipolar disorder, manic depression, hearing voices, suicidal tendencies, TBI, no feeling in the fourth and fifth

fingers of his left hand, and numbness and tingling in his left hand. (AR 186.) He explained that the voices in his head "c[a]me and [went]," causing him to "lose track of what [he was] doing," and that the depression caused him to "feel[] bad about [him]self." (*Id.*) Jelliffe's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. The hearing was conducted on July 30, 2010 by Administrative Law Judge ("ALJ") Thomas Merrill. (AR 23-51.) Jelliffe appeared and testified, and was represented by counsel. In addition, vocational expert ("VE") Howard Steinberg testified at the hearing. On October 20, 2010, the ALJ issued a decision finding that Jelliffe was not disabled under the Social Security Act from his alleged onset date through the date of the decision. (AR 7-15.) A few months later, the Decision Review Board notified Jelliffe that it had not completed its review of the claim during the time allowed, rendering the ALJ's decision the final decision of the Commissioner. (AR 1-3.) Having exhausted his administrative remedies, Jelliffe filed the Complaint in this action on April 6, 2011. (Doc. 3.)

### **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that, although Jelliffe had engaged in some "under the table" work since the alleged disability onset date of April 2, 2007, he had not engaged in substantial gainful activity since that date.  (AR 9-10.)  At step two, the ALJ found that Jelliffe's bipolar disorder and poly-substance

4

abuse were "severe," but his alleged TBI and left arm abnormality were not. (AR 10.) At step three, the ALJ found that none of Jelliffe's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 10-11.) Next, the ALJ determined that Jelliffe had the RFC to perform "a full range of work at all exertional levels," with the following nonexertional limitations:

> [Jelliffe] has sufficient understanding and memory for one to three step instructions. He has sufficient concentration[,] persistence[,] and pace to sustain for two-hour blocks of time through the workday and workweek on one to three step, low stress activities. He has no significant limitation in social interaction. He can manage changes expected in one to three step work activities. He is aware of hazards and can travel, but he may need some help planning and setting goals.

(AR 12.) Given this RFC, and based on testimony from the VE, the ALJ found that Jelliffe was capable of performing his past relevant work as an auto lot attendant, a housekeeper, and a stock clerk. (AR 14-15.) The ALJ concluded that Jelliffe had not been under a disability from the alleged onset date of April 2, 2007 through the date of the decision. (AR 15.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Analysis**

Jelliffe argues that the ALJ erred in failing to identify his TBI and left arm abnormality as severe impairments. The regulations define a "severe" impairment as one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Despite this somewhat stringent language, the

6

Second Circuit has held that the ALJ's step two severity analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). In accord, the Social Security Administration has used lenient language in describing the claimant's burden of demonstrating a "severe" impairment:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [step two of the sequential evaluation] when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work* even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has *no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities*).

SSR 85-28, 1985 WL 56856, at *3 (1985) (emphases added).

The ALJ found that Jelliffe's TBI was "non-severe" because there was "no indication that [Jelliffe's 1974 depressed skull fracture] caused any long-lasting cognitive dysfunction." (AR 10.) The ALJ explained that the injury appeared to have "healed properly with surgical intervention without any persistent complications." (*Id.*) Later in his decision, the ALJ noted that "[t]here is no indication of . . . cognitive dysfunction, or intellectual deficits" (AR 11), and that "there is little evidence of any long[-]lasting deficits related to [Jelliffe's] reported childhood head injury" (AR 14). Although the record does indicate that Jelliffe initially had a good physical recovery from his 1974 accident and consequent surgery (*see, e.g.,* AR 335), substantial evidence does not support the ALJ's finding that Jelliffe suffered no long-term cognitive dysfunction or intellectual deficits during the alleged disability period.

7

Rather, psychologist Dr. Richard Root, who completed a neuropsychological assessment of Jelliffe in August 2008, opined as follows: "Neuropsychological testing indicates he is functioning broadly in the borderline range of intellectual functioning at this time. . . . His neuropsychological testing is interpreted to be broadly reliable and valid and consistent with a Traumatic Brain Injury . . . from the [motor vehicle accident] at the age of 4 ½ . . . ."[1] (AR 417.) Dr. Root diagnosed Jelliffe with "Dementia due to Head Trauma" and "Borderline Range of Intellectual Functioning." (*Id.*) In support of these diagnoses, Dr. Root's reported testing revealed multiple index scores classifying Jelliffe's cognitive abilities as borderline or impaired. (AR 414-16.) In particular, Dr. Root stated that Jelliffe's reaction time and vigilance were in the borderline range, and his mental tracking and verbal retrieval skills were in the impaired range. (AR 417.) In September 2008, Dr. Root conferred with one of Jelliffe's providers from Health Care & Rehabilitation Services about Jelliffe's "cognitive deficits due to TBI." (AR 580.) In July 2010, another of Jelliffe's medical providers, psychiatrist Dr. Ray Abney, stated in response to Jelliffe's attorney's interrogatories, "[Jelliffe] suffered a traumatic brain injury in the past with resulting impairment of memory [and] concentration[,] and has [increased] irritability with poor decision[-]making."[2] (AR 902.) Yet another of Jelliffe's providers, Matrix Health Systems & Otter Creek Associates, suspected a diagnosis of TBI in October 2008, stating: "R/O cognitive [disorder secondary to] TBI."

---

[1] Although the ALJ described Dr. Root's neuropsychological assessment, he did not assess its weight. (*See* AR 13.)

[2] Having failed to weigh Dr. Root's neuropsychological assessment, the ALJ assigned "little evidentiary weight" to Dr. Abney's opinion on the grounds that "there is little evidence of any longstanding deficits related to [Jelliffe's] reported childhood head injury." (AR 14.)

8

(AR 421.) And finally, Jelliffe's former employer from his almost three-year job as a construction groundskeeper, stated that Jelliffe was a "slow learner" and "ha[d] trouble retaining knowledge." (AR 241-42.) This evidence demonstrates that Jelliffe's TBI was "severe," i.e., it had "more than a minimal effect on [Jelliffe's] . . . ability . . . to perform basic work activities." SSR 85-28, 1985 WL 56856, at *3.

The Commissioner asserts that, because the ALJ based his mental RFC findings on the opinions of the agency psychologists, and because one of those psychologists, Dr. Farrell, accepted Jelliffe's TBI as severe at step two (*see* AR 588-89), and another of those psychologists, Dr. Patalano, affirmed Dr. Farrell's findings (*see* AR 615); it can be inferred that "the ALJ's ultimate mental RFC findings are based in part on the severe residuals of a [TBI]." (Doc. 15 at 15.) There is no law supporting this proposition, i.e., that where an ALJ explicitly affords weight to agency consultant opinions, the court should infer that the ALJ also implicitly adopted every finding included in those opinions. Rather, the law, as stated above, requires the ALJ to proceed through the five-step sequential process, and state his or her decisions at each step, including step two. The Court is not persuaded by the Commissioner's citation to *Green v. Apfel*, 25 F. App'x 54, 56 (2d Cir. 2001). (*See* Doc. 15 at 15.) There, the Second Circuit found that the ALJ's determination that the plaintiff's statements concerning the extent of his pain were not credible was supported by substantial evidence, including the reports of treating doctors and the plaintiff's own testimony. *Green*, 25 F. App'x at 56. In contrast, here, substantial evidence does not support the ALJ's findings that there was "no indication that [Jelliffe's 1974 depressed skull fracture] caused any long-lasting cognitive

9

dysfunction" (AR 10), that "[t]here is no indication of . . . cognitive dysfunction, or intellectual deficits" (AR 11), and that "there is little evidence of any long[-]lasting deficits related to [Jelliffe's] reported childhood head injury" (AR 14). Rather, the evidence demonstrates that Jelliffe's TBI caused more than a minimal effect on his ability to work, and thus was a severe impairment.

Likewise, there is evidence demonstrating that Jelliffe's left arm/hand impairment was a severe impairment, despite the ALJ's finding that "there is no evidence that this longstanding abnormality has caused any more than minimal functional limitations since the alleged onset date." (AR 10.) An August 2008 treatment note from Jelliffe's treating primary care provider, certified physician's assistant Anthony Petrillo, states that there was "marked abnormality" in Jelliffe's left hand, and Jelliffe was "concerned about the pain and the fact that his level of function restricts the use of [that] hand." (AR 440.) The note further states: "[c]onsider narcotics." (*Id.*) In an October 2008 treatment note, Petrillo stated:

> Hand pain traumatic is described as being located in the left. The onset of the pain has been sudden (crush injury remote) and has been occurring in a persistent pattern for years. The course has been constant. The pain is moderate [and] . . . characterized as a cramping. The pain is aggravated by physical activity. The pain has been relieved by medication (using oxycodone/APAP 5/day). The symptoms have been associated with muscle stiffness, joint swelling, painful [range of motion,] and decreased [range of motion] . . . . The pain was preceded by trauma. . . . Had multiple surgeries remotely.

(AR 434; *see also* AR 652.) In a December 2008 treatment note, Petrillo described Jelliffe's arm/hand as follows: "claw[-]like posture with loss of extensor tendon to 5th finger; [m]arked atrophy distal forearm in graft site[; h]e reports a lot of pain with

10

flexion." (AR 439.) Presumably, Petrillo would not have prescribed narcotics (oxycodone) to relieve Jelliffe's arm/hand pain (*see, e.g.,* AR 432-34, 437) if he did not believe the pain existed. Moreover, if Petrillo did not believe Jelliffe's allegations of arm/hand pain, he would not have stated in an August 2010 Medical Source Statement that Jelliffe was impaired in his left upper extremity due to an "old crush injury," and the symptoms of this impairment were pain and muscle weakness. (AR 903-04.)

Other providers also noted Jelliffe's arm/hand problems. For example, in July 2006, certified physician's assistant John Bond noted that "[Jelliffe's] left forearm is disfigured following a motor vehicle accident several years ago. He has loss of muscle and some atrophy of his hand." (AR 526.) And in October 2009, treating physician Dr. Geoffrey Kane noted in a Discharge Summary from Brattleboro Retreat that Jelliffe had "[e]xtensive muscle atrophy and scarring of [his] left forearm and hand," and "encouraged" Jelliffe to "follow up with a primary care provider after discharge, particularly for care of chronic conditions." (AR 624.) This evidence, none of which the ALJ considered in his opinion, indicates that Jelliffe's arm condition had "more than a minimal effect on [Jelliffe's] . . . ability . . . to perform basic work activities." SSR 85-28, 1985 WL 56856, at *3.

The Commissioner argues that any error the ALJ may have made at step two was harmless because the ALJ found other impairments severe and thus proceeded to the next step of the sequential analysis. It is true that, in general, an ALJ's failure to make an explicit finding of a step-two impairment where substantial evidence supports the presence thereof, does not in and of itself require remand. *See, e.g., Pompa v. Comm'r of*

*Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). However, where the omitted impairment was not accounted for in the ALJ's RFC determination, or in other words, where the ALJ's step-two error prejudiced the plaintiff at later steps in the sequential evaluation process, remand is required. *See, e.g., Elliott v. Comm'r of Soc. Sec.*, No. 09-1195-HA, 2011 WL 1299623, at *4 (D. Or. Mar. 31, 2011) ("The general proposition that failures at step two may be harmless *if the ALJ discusses the impairments and assesses limitations as a result of that impairment*, . . ., underscores the significance of the error in this case— the ALJ failed to adequately discuss the impairments at issue, and a determination as to whether plaintiff's limitations were fully assessed in connection with these impairments is impossible to ascertain.") (emphasis added); *cf. Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding that any error ALJ committed in failing to list plaintiff's bursitis at step two was harmless, because the ALJ "extensively discussed" the bursitis and "considered any limitations posed by [it] at [s]tep 4"). Here, the ALJ did not adequately consider Jelliffe's TBI or arm impairment in assessing his RFC. (*See* AR 12.) The ALJ found no limitations in Jelliffe's use of his left upper extremity, and the ALJ's RFC determination that Jelliffe was capable of understanding and remembering up to three-step instructions does not properly account for Jelliffe's TBI and resulting cognitive dysfunction. Therefore, the ALJ's step-two error was not harmless, and the matter should be remanded for a new decision starting at step two.

## **Conclusion**

For these reasons, I recommend that Jelliffe's motion (Doc. 12) be GRANTED; the Commissioner's motion (Doc. 15) be DENIED; and the matter be REMANDED for further proceedings and a new decision. Because I recommend remanding for a reassessment of the severity of Jelliffe's TBI and arm deformity at step two of the sequential analysis, the Court need not reach Jelliffe's remaining claims. The ALJ's evaluation of the opinion evidence, as well as his credibility and RFC determinations, were affected by the ALJ's step-two error, and thus must begin anew on remand.

Dated at Burlington, in the District of Vermont, this 7th day of March, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).